UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
WOODY ALLEN,                              :
                                         :
            Plaintiff,                    :          Civil Action No. 08 CV 3179 (TPG) (KNF)
                                         :
      -- against --                       :
                                         :
AMERICAN APPAREL, INC.,                   :
                                         :
            Defendant.                    :
-----------------------------------------------------x

---

## DEFENDANT AMERICAN APPAREL, INC.'S MEMORANDUM IN SUPPORT OF ITS

## MOTION FOR SUMMARY JUDGMENT

---

BUCHANAN INGERSOLL & ROONEY PC
620 Eighth Avenue, 23rd Floor
New York, NY 10018

*Attorneys for Defendant American Apparel, Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 1

   The Meteoric Rise of Dov Charney and His Company, American Apparel ............................ 1

   The Media Vilifies Mr. Charney and Turns Against American Apparel ................................ 2

   The Woody Allen/*Annie Hall* Epiphany ................................................................. 3

   The Display of the Images ................................................................................. 4

   The Images as Mr. Charney's Artistic Expression, Social Commentary and Art
   Parody ................................................................................................... 5

   Mr. Charney Consistently Champions the First Amendment's Freedom of
   Expression .............................................................................................. 6

ARGUMENT ................................................................................................... 7

   I.   This Is an Appropriate Case for Summary Judgment. .......................................... 7

      A.   The Standard for Summary Judgment. .................................................... 7

      B.   It is a Question of Law for this Court to Determine Whether the
      Images Constitute Protected Speech. ......................................................... 8

   II.   The Lanham Act Claim Should be Dismissed. ................................................ 9

      A.   The Images are Entitled to First Amendment Protection as Expressive
      Speech. ................................................................................................ 10

         1.   The Images are Not Commercial Speech. .......................................... 12

         2.   Even Mixed Commercial and Noncommercial Speech Is Protected
         by the First Amendment. .............................................................. 14

      B.   Under the *Rogers* Test, the Lanham Act Claim Must be Denied. ................... 15

   III.   American Apparel is also Entitled to Summary Judgment on the New
   York Civil Rights Act Claim Based on the Free Speech Guarantees of the
   First Amendment and Article 1, Section 8 of the New York State
   Constitution. ........................................................................................... 19

CONCLUSION ................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ann-Margret v. High Society Magazine, Inc.*, 498 F. Supp. 401 (S.D.N.Y. 1980) ................ 11, 20

*Bd. of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 109
    S.Ct. 3028 (1989) ............................................................................................ 12

*Berry v. City of New York*, 97 F.3d 689 (2d Cir. 1996) ................................................ 10

*Beverly v. Choices Women's Medical Center, Inc.*, 78 N.Y. 2d 745 (1991) ................................ 20

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 103 S.Ct. 2875 (1983) .................................. 12

*Burck v. Mars Inc.*, 571 F. Supp.2d 446 (S.D.N.Y. 2008) ................................................ 12, 15, 20

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ............................................................. 11

*Cardtoons, L.C. v. Major League Baseball Players Assoc.*, 95 F.3d 959 (10th
    Cir.1996) ............................................................................................................. 11

*Central Hudson Gas and Electric Corp. v. Pub. Serv. Comm'n of New York*, 447
    U.S. 557, 100 S.Ct. 2343 (1980) ........................................................................ 12

*City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S.Ct. 1505
    (1993) ................................................................................................................... 12

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc.,* 886 F.2d 490 (2d
    Cir.1989) ............................................................................................................. 17

*Cohen v. Herbal Concepts,* 63 N.Y.2d 379 (1984) .......................................................... 20

*Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal.4th 387, 106
    Cal.Rptr.2d 126, 21 P.3d 797, 804 (2001) ...................................................... 10, 11

*Connick v. Myers*, 461 U.S. 138,  103 S.Ct. 1684, 75 L.Ed.2d  (1983) ......................................... 8

*Croton Watch Co., Inc. v. Nat'l Jeweler Magazine, Inc.,* No. 06-662, 2006 WL
    2254818 (S.D.N.Y. Aug. 7, 2006) ...................................................................... 9

*Donini Int'l, S.P.A. v. Satec (USA) LLC*, No. 03-9471, 2004 WL 1574645
    (S.D.N.Y. July 13, 2004) ................................................................................... 9

*ETW v. Corp. v. Jireh Publishing, Inc.*, 332 F.3d 915 (6th Cir. 2003) ................................ passim

*Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008) ...................................... 13

*Gordon and Breach Sci. Publishers S.A. v. American Inst. of Physics*, 859 F.Supp. 1521 (S.D.N.Y. 1994) ............................................................................................ 9

*Hoepkere v. Kruger*, 200 F. Supp. 2d 340 (S.D.N.Y. 2002).................................................... 11, 20

*Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001)........................................... 14

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995) ...................................................................................................... 10

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) ................................................................ 11

*Lacoff v. Buena Vista Pub., Inc.*, 183 Misc. 2d 600, 705 N.Y.S.2d 183 (N.Y. Sup. Ct. 2000)................................................................................................................ 9, 12

*Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp.2d 1120 (C.D. Cal. 1998) ............................... 8, 15

*Molina v. Phoenix Sound Inc.*, 297 A.D.2d 595 (1st Dept. 2002) ................................................ 20

*Mulcahey v. Mulrenan*, No. 06-4371, 2008 WL 110949 (S.D.N.Y. Jan. 03, 2008)..................... 8

*New York Public Interest Research Group, Inc. v. Insurance Information Institute*, 161 A.D.2d 204, 554 N.Y.S.2d 590 (1st Dep't 1990) ............................................... 13

*New York State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 840 (2d Cir. 1994) ................... 12

*Nicols v. Moore*, 334 F. Supp. 2d 944 (E.D. Mich. 2004) ............................................................ 9

*Pirone v. MacMillan, Inc.*, 894 F.2d 579 (2d Cir. 1990) .............................................................. 19

*Portside Growth and Opportunity Fund v. Gigabeam Corp., Inc.*, 557 F. Supp.2d 427 (S.D.N.Y. 2008) .......................................................................................... 8

*Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781 (1988) ............................................................... 14

*Roe v. City of Waterbury,* 542 F.3d 31 (2d Cir. 2008)................................................................... 7

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989)................................................................. passim

*Rubino v. Slaughter,* 136 N.Y.S.2d 873 (N.Y. Sup. Ct. 1954) .................................................... 20

*Schoeman v. Agon Sports, LLC*, 816 N.Y.S.2d 701 (N.Y. Sup. Ct. 2006) ................................. 20

*Simeonov v. Tiegs,* 159 Misc.2d 54, 602 N.Y.S.2d 1014 (N.Y.City Civ.Ct. 1993)..................... 20

*Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302 (N.D. Ga. 2008) ...................................... 8

*Sugar Busters LLC v. Brennan,* 177 F.3d 258 (5th Cir. 1999) .................................................... 15

*United States Olympic Comm. v. American Media, Inc.*, 156 F. Supp. 2d 1200 (D. Colo. 2001)............................................................................................................................... 9

*Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 632, 100 S.Ct. 826 (1980) ......................................................................................................... 14

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ..................................................... 12

*Washpon v. Parr*, 561 F. Supp. 2d 394 (S.D.N.Y. 2008) ............................................................... 8

*Waters v. Moore,* 70 Misc.2d 372, 334 N.Y.S.2d 428 (N.Y. Sup. Ct. 1972) ............................... 20

*William O'Neil & Co., Inc. v. Validea.com, Inc.*, 202 F. Supp. 2d 1113 (C.D. Cal. 2002) .............................................................................................................................. 9

*Winter v. DC Comics*, 69 P.3d 473 (Cal. 2003).............................................................................. 8

## Statutes and Rules

15 U.S.C. § 1125(a) ........................................................................................................................ 9

Fed. R. Civ. P. 56(c) ....................................................................................................................... 7

Section 50 of the New York Civil Rights Act ............................................................................... 19

Section 51 of the New York Civil Rights Act ............................................................................... 19

## Other Authorities

135 Cong. Rec. H1216 (1989) ...................................................................................................... 16

## Constitutional Provisions

U.S. Const. amend. I……………………………………………………………………...passim

N.Y. Const. art. I, § 8………………………………………………………………………….19

**PRELIMINARY STATEMENT**

This Motion turns on a single legal question:  Was American Apparel's use of Woody Allen's likeness as the character Alvy Singer (photographed from the movie "Annie Hall") protected by the First Amendment?  It is undisputed that American Apparel's purpose in displaying the film images was to draw the public's attention to parallels between the public controversies surrounding Mr. Allen and analogous publicly reported alleged improprieties that haunted Mr. Charney.  By doing so, American Apparel hoped to provoke public debate on matters of particular social significance.  Because there is no evidence whatsoever that American Apparel had any commercial purpose in displaying the Woody Allen film images (let alone a primary commercial purpose), American Apparel's conduct is protected by the First Amendment.

The First Amendment protection afforded American Apparel's public speech and artistic expression outweighs the federal trademark and New York state privacy and publicity rights held by Mr. Allen.  Under the *Rogers v. Grimaldi* test, which the Court should apply in this case, both of Plaintiff's claims must fail.

**STATEMENT OF FACTS**

All of the material facts and evidentiary citations therefor that are relevant to this Motion are set forth in the accompanying Statement of Material Undisputed Facts.  The facts most important to this Motion are set forth below for the Court's convenience.

**The Meteoric Rise of Dov Charney and His Company, American Apparel**

American Apparel has evolved from a one-man, street-based operation, into a successful public company employing thousands of people throughout North America.  From inception, Mr. Charney has insisted that American Apparel produce quality, sexy and fashionable clothing,

1

manufactured without utilizing "sweatshop labor" produced in foreign factories, and all the while remaining friendly to the environment and socially responsible.

Mr. Charney has also been the creative force behind the highly distinctive advertising and sales campaigns associated with American Apparel. Mr. Charney is responsible for creating American Apparel's distinctive advertisements and sales/marketing materials that show images of ordinary people (as opposed to showing images of professional models), often scantily-clad in American Apparel clothing and accessories. These often sexually provocative photographs, associated with virtually all of American Apparel's commercial endeavors, are distinctive and easily recognizable by consumers as American Apparel advertisements. While some people adore American Apparel's signature sales and advertising style (and praise the company for using real people in print ads and not touching up the photographs), some people call it soft-core pornography. But no matter whether a viewer approves or disapproves of the content of American Apparel's sales and promotional materials, one can easily and quickly recognize American Apparel print advertisements and billboards, even with just a cursory glance.

From 2000 to 2004, American Apparel was regarded as one of the most successful start-up fashion companies in the industry. Regularly, the press and various media outlets reported very favorably on American Apparel and Mr. Charney.

**The Media Vilifies Mr. Charney and Turns Against American Apparel**

Starting with an article about Mr. Charney and American Apparel that appeared in the June 2004 installment of *Jane* magazine, the media's coverage of American Apparel changed dramatically. The *Jane* article was one of the first in series of character assassination pieces appearing in the press that focused on Mr. Charney's alleged sexual misdeeds. Subsequent to the release of the *Jane* article, a series of sexual harassment lawsuits commenced in 2005 by opportunistic former employees.

Rather than focus on the many and continuing accomplishments of American Apparel and the business successes of Mr. Charney, the media and press were now focused almost exclusively on Mr. Charney, and almost exclusively focused on Mr. Charney's sex life (real and imaginary). The press and media focused on allegations made against Mr. Charney, and rarely, if ever, bothered to present a fair and unbiased report, or even to wait to see whether any of the allegations made against Mr. Charney were even true.

The accusations made against Mr. Charney affected him deeply and caused him great personal anguish. Mr. Charney was increasingly devoting resources to dealing with lawsuits, and attempting to correct the many lies, misrepresentations, misinformation and misunderstandings that were continually being circulated about him. Once a media darling, Mr. Charney had become a publicly ridiculed and demonized figure, who was being pre-judged by the public based on allegations and false and misleading bits of information. In fact, during this period of time, unknown individuals placed fake American Apparel advertisements on the Internet and in print media falsely attributing offensive quotes on domestic violence and sexual harassment to Mr. Charney.

**The Woody Allen/*Annie Hall* Epiphany**

In April of 2007, Mr. Charney was viewing the movie *Annie Hall* on a television in his home. During a certain and highly memorable scene in that movie, Mr. Charney had an epiphany. That scene involves the Alvy Singer character portrayed by Woody Allen, who is eating Easter dinner at the table of Annie Hall's gentile grandmother. In that scene, Alvy Singer imagines his girlfriend's grandmother looking at him (and judging him) in full Hasidic Jewish garb with a full mustache and beard and wearing a black hat. Mr. Charney immediately connected with the thrust of the scene that the character was uncomfortable as he was being perceived negatively by those around him. Mr. Charney felt that the dream sequence in that

scene captured many of the feelings that Mr. Charney himself wanted to express about being misunderstood and wrongly cast in the media.  Not only did Mr. Charney connect to the character's predicament in the scene, Mr. Charney connected to the public scandal that had plagued Mr. Allen's personal life.  While watching that scene, it all came together for Mr. Charney – that Mr. Charney was like the Alvy Singer character and like Mr. Allen himself and that he was suffering much of the same pain they had suffered (whether fictionally or reportedly).  Mr. Charney also found the humor and self-mocking associated with the unfair judgment and criticism experienced by both the Alvy Singer character and Woody Allen personally.

In a moment of artistic inspiration, Mr. Charney then immediately began the process of taking digital photographs of certain scenes from the movie.  Using the controls on his television recording system, he searched for and paused the *Annie Hall* movie on precisely the scene that had inspired him—the scene in which the Alvy Singer character at that table tilts his glasses upward.  He then manipulated the digital photographs using a computer program, adjusting the color, the clarity and other artistic aspects of the photographs, all in furtherance of his artistic vision.  It was an artistic process during which adjustments were made to the digitally photographed images according to Mr. Charney's artistic vision.

That same evening Mr. Charney telephoned a colleague to discuss his concept.  Iris Alonzo, a creative director at American Apparel, recalls Mr. Charney telling her that evening that the image of Woody Allen in Hasidic garb was Dov Charney – "That's me.  That's me."

**The Display of the Images**

Mr. Charney was the sole and driving creative force behind the Images.  It was his artistic vision, and his alone.  No American Apparel employee in charge of advertising or sales or marketing pitched this idea to Mr. Charney.

In May of 2007, Mr. Charney caused his company, American Apparel, to put up billboards in the Lower East Side of New York City and in Echo Park, a neighborhood of Los Angeles.[1]  Both of those locations were chosen by Mr. Charney because they are creative communities where he wanted to direct his message to his peers.  That fact is reinforced by Mr. Charney electing to superimpose the Yiddish text on the billboards, which claimed that the image displayed was "The Holy Rebbe" or "Our Spiritual Leader."

**The Images as Mr. Charney's Artistic Expression, Social Commentary and Art Parody**

Mr. Charney testified at length during his deposition as to what he intended to convey to people through the public display of the Images.  On one level, the billboards were about Mr. Charney's relation to the Alvy Singer character.  The scene featured on the billboards expressed how Mr. Charney was feeling out of place and misunderstood with respect to the manner in which he was being portrayed in the media.  Indeed, Mr. Charney could empathize with the self-consciousness and embarrassment that the Alvy Singer character felt from the grandmother's disdain.

On another level, the Images are about Woody Allen, the public figure.  Mr. Charney believed that by referencing the image of Mr. Allen, he was identifying his own circumstance with that of Mr. Allen's life experiences.  Given the media scrutiny of Mr. Charney, he could easily relate to the obsessive media scrutiny of Mr. Allen's personal life, which tragically overshadowed his art and work product.  By displaying the Images, Mr. Charney hoped to call upon people to see beyond media and lawsuit-inspired scandal, and to consider people for their true value and for their contributions to society.

---

[1]     This was not the first time that Mr. Charney used billboard space to convey a non-commercial message.  At other times before displaying the Images, Mr. Charney has used billboard space to convey a social and political message about immigration, and he has also used billboard space to find his lost dog.

On yet another level, the billboards reflect a significant aspect of Mr. Charney's own personality. He believed them to be an art parody, inherent with self-mocking humor. Both Mr. Charney and Mr. Allen are artists, controversial figures and work their craft within the confines of a larger society not always comfortable with their product or the messages in them. Even with this mainstream criticism directed at Mr. Charney, he wished to convey a sense of humor in responding to the criticism, which he believed was captured in the screenshots that he selected for the Images.

Mr. Charney believed his Images to be protected as artistic expression and social commentary by the First Amendment. He expressed that belief repeatedly to his colleagues.[2] Because he did not believe displaying the Images to be a commercial endeavor, he did not think that American Apparel was required to obtain the consent of Mr. Allen to incorporate his likeness into the Images.

### Mr. Charney Consistently Champions the First Amendment's Freedom of Expression

At an early age, Mr. Charney was already in tune with artistic freedom of expression. In his high school yearbook from Canada, he quotes Canadian law guaranteeing freedom of speech and expression. Years before the Images were displayed, Mr. Charney appeared on the *Charlie Rose* show and stated that he expressed himself through digital photography. And just a couple of months before the Images were publicly displayed in April and May of 2007, Mr. Charney had a private e-mail exchange with his mother (which was later posted on one of American Apparel's websites) that shines a bright light on Mr. Charney's beliefs about the freedom to make and express art. Responding to an e-mail from his mother complaining about a magazine

---

[2]     Others at American Apparel likewise did not believe the Images were part of an advertisement or that they were being displayed for commercial purposes. In fact, according to Alexandra Spunt, it would have been against American Apparel policy to use a celebrity or a celebrity likeness for advertising or marketing purposes. As discussed, a critical element of American Apparel's philosophy is to use ordinary people in sales advertisements and marketing.

carried in American Apparel retail stores called *Butt*, Mr. Charney explained his beliefs

concerning freedom of expression:

> Butt is an important magazine that I support.
> No question, that it is going to offend people and it is my feeling that that is the nature of provocative art.
> At times, to make progress, you end up offending people.
> And people were offended [with] many things I have done over the years. But I did what I felt was right, especially from an art and creative point of view.
>
> We are going somewhere with what we are doing, and no one is required to buy it.
> Many people have told me how much they appreciate our carrying the magazine.
> It has sold out in some stores.
>
> Also, because some moralistic anti-gay forces opposed our carrying it within our company, I am committed to having it.
> I wanted our company to be open enough to accommodate this kind of magazine, and if I don't set the precedent now, it could become too late to get that done late….
> Sexual freedom, art, and photography are important to me and I am standing firm on my support for *Butt*.

## ARGUMENT

I.    **This Is an Appropriate Case for Summary Judgment.**

A.    **The Standard for Summary Judgment.**

Summary judgment must be granted "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue

of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party. A fact is material if it might affect the outcome of the suit under the

governing law." *Roe v. City of Waterbury,* 542 F.3d 31, 35 (2d Cir. 2008) (citation and internal

marks omitted). Summary judgment is appropriate "if the nonmoving party does not present

evidence from which a reasonable jury could return a favorable verdict." *See*, *e.g.*, *Washpon v.*

*Parr*, 561 F. Supp. 2d 394, 402 (S.D.N.Y. 2008); *Portside Growth and Opportunity Fund v. Gigabeam Corp., Inc.*, 557 F. Supp.2d 427, 430 (S.D.N.Y. 2008).

**B.      It is a Question of Law for this Court to Determine Whether the Images Constitute Protected Speech.**

In resolving this Motion, this Court must determine, as a question of law, the level of First Amendment protection to which Mr. Charney's Images are entitled—*i.e.*, whether the Images constitute artistic expression, commercial speech or a mixture of commercial and non-commercial speech.  Generally speaking, the issue of the First Amendment's protection of speech is not a matter for trial.  Rather, it is a legal categorization that must be resolved through this Court's independent review of the Images.  As the Supreme Court has made clear, "[t]he inquiry into the protected status of speech is one of law, not fact." *See Connick v. Myers*, 461 U.S. 138, 148 n. 7, 150 n. 10, 103 S.Ct. 1684, 75 L.Ed.2d  (1983) ("[W]e are compelled to examine for ourselves the statements in issue and the circumstances under which they are made to see whether…they…are of a character which the principles of the First Amendment…protect." (quotation marks omitted)); *see also Mulcahey v. Mulrenan*, No. 06-4371, 2008 WL 110949, at *4 (S.D.N.Y.  Jan. 03, 2008) ("Importantly, particularly for a motion for summary judgment, the 'inquiry into the protected status of speech is one of law, not fact.'" (quoting *Connick*)); *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1316 (N.D. Ga. 2008) (quoting *Connick*, and ruling on motion for summary judgment to dismiss Lanham Act claims on basis that alleged infringement was protected as parody); *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp.2d 1120, 1136 (C.D. Cal. 1998) (same).  This is well supported by the principle that, because "unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable." *Winter v. DC Comics*, 69 P.3d 473, 480 (Cal. 2003) (citation omitted) (holding that whether comic book

depiction of rock musicians was commercial speech could be determined as a matter of law by reviewing the material in question). It is therefore appropriate for this Court to determine, as a matter of law, whether the Images are works of artistic expression, commercial speech, or a mix thereof, based upon its own review of American Apparel's creations.[3]

## II.    The Lanham Act Claim Should be Dismissed.

Mr. Allen's false endorsement claim under section 43 of the Lanham Act, 15 U.S.C. § 1125(a), rests on the allegation that American Apparel implied to the consuming public, based upon the use of the "Alvy Singer/Woody Allen" images within the visual displays created by Mr. Charney, that Mr. Allen endorsed American Apparel and its garments. Ordinarily, the controlling issue would be likelihood of confusion. Because Mr. Charney's Images are entitled to First Amendment protection, however, this is not an ordinary false endorsement claim, and a different test must apply. Under the two-part test established in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), Lanham Act claims arising from works of creative expression are barred *unless* the use of the celebrity's name or likeness "has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the [usage of the celebrity's name or likeness] explicitly misleads as to the source or the content of the work." *Id.* at 999.

---

[3]    Courts routinely make this determination in Lanham Act cases. *See, e.g., Croton Watch Co., Inc. v. Nat'l Jeweler Magazine, Inc.*, No. 06-662, 2006 WL 2254818, at *10 (S.D.N.Y. Aug. 7, 2006) (dismissing Lanham Act claim because the "non-commercial nature of a journalist's article cannot be overcome by plaintiff claiming an improper purpose motivated the publisher to run the article"); *Nicols v. Moore*, 334 F. Supp. 2d 944, 956 (E.D. Mich. 2004) (dismissing right of publicity claim on finding that film "Bowling for Columbine" is not commercial speech); *Donini Int'l, S.P.A. v. Satec (USA) LLC*, No. 03-9471, 2004 WL 1574645, at *7 (S.D.N.Y. July 13, 2004) (dismissing Lanham Act claim on ground that articles in trade magazine critical of plaintiff's products were not commercial speech, notwithstanding allegations of conspiracy between publisher and competitor); *William O'Neil & Co., Inc. v. Validea.com, Inc.*, 202 F. Supp. 2d 1113, 1119 (C.D. Cal. 2002) (dismissing commercial misappropriation claim on ground that book on stock investing strategies "does not 'propose a commercial transaction' and is therefore not commercial speech") (citation omitted); *Gordon and Breach Sci. Publishers S.A. v. American Inst. of Physics*, 859 F. Supp. 1521 (S.D.N.Y. 1994) (holding on motion to dismiss that academic articles challenged under Lanham Act were not commercial speech based on allegations in the complaint and review of the articles); *United States Olympic Comm. v. American Media, Inc.*, 156 F. Supp. 2d 1200, 1204, 1206-09 (D. Colo. 2001) (holding on motion to dismiss that magazine was not commercial speech); *Lacoff v. Buena Vista Pub., Inc.*, 183 Misc. 2d 600, 705 N.Y.S.2d 183 (N.Y. Sup. Ct. 2000) (determining on motion to dismiss that investment book was not commercial speech).

American Apparel's conduct is not actionable because the images used clearly have "artistic relevance to the underlying work" and no explicit or express misstatement about Mr. Allen's association with American Apparel was made. *Id.*

### A.    The Images are Entitled to First Amendment Protection as Expressive Speech.

It cannot be disputed that the Images are protected by the free speech guarantees of the First Amendment. The protection of the First Amendment "looks beyond written or spoken words as mediums of expression" and protects other modes of communicating ideas as well. *See Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 569 (1995). These modes include visual arts, such as photography and film. *See Berry v. City of New York*, 97 F.3d 689, 695 (2d Cir. 1996) (stating that "[v]isual art is as wide ranging in its depiction of ideas, concepts and emotions as any book, treatise, pamphlet or other writing, and is similarly entitled to full First Amendment protection."). Case law makes clear that "First Amendment doctrine does not disfavor nontraditional media of expression." *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal.4th 387, 106 Cal.Rptr.2d 126, 21 P.3d 797, 804 (2001), *cert. denied*, 534 U.S. 1078, 122 S.Ct. 806, 151 L.Ed.2d 692 (2002).

While the choice of media was untraditional and though Mr. Charney's Images incorporated preexisting screenshots of "Alvy Singer" from the film *Annie Hall*, his choice and manipulation of the screenshots and insertion of Yiddish text to communicate his own personal message is protected by the First Amendment. "[T]hrough their pervasive presence in the media, sports and entertainment celebrities have come to symbolize certain ideas and values in our society and have become a valuable means of expression in our culture." *ETW v. Corp. v. Jireh Publishing, Inc.*, 332 F.3d 915, 937-38 (6th Cir. 2003) (granting First Amendment protection to print of golfer Tiger Woods); *see also Cardtoons, L.C. v. Major League Baseball Players Assoc.*,

95 F.3d 959, 972 (10th Cir. 1996) ("Celebrities ... are an important element of the shared communicative resources of our cultural domain.").

Mr. Charney's use of the *Annie Hall* screenshots as a mode of his own personal expression and commentary is not without precedent in American culture.  As the California Supreme Court has observed, the silkscreens of famed artist Andy Warhol "may well be entitled to First Amendment protection" even though they are no more than literal representations of existing celebrity images, because Warhol's recontextualization of those images was itself expressive.  *See Comedy III Productions, Inc.*, 25 Cal.4th at 408-409, 21 P.3d 797 at 106 Cal.Rptr.2d at 143 ("Through distortion and the careful manipulation of context, Warhol was able to convey a message that went beyond the commercial exploitation of celebrity images and became a form of ironic social comment on the dehumanization of celebrity itself."); *see also Hoepkere v. Kruger*, 200 F. Supp.2d 340, 349 (S.D.N.Y. 2002) (dismissing New York state law invasion of privacy claims, because artist Barbara Kruger's collage using found photograph that depicted plaintiff was entitled to First Amendment protection).

Mr. Charney is not insisting that his Images rise to the level of "fine art" – nor do they need to in order to acquire First Amendment protection.[4]  But the basic point remains that quotation of another's speech, even when that quotation is visual, as here, is a valuable part of modern cultural expression.  *See, e.g., Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994) (defining parody as "the use of some elements of a prior author's composition to create a new one that, at least in part, comments on the author's works"); *Burck v. Mars Inc.*, 571 F.

---

[4]      Whether creative expression is worthy of museum display, or even has any acknowledged quality or taste, of course does not affect whether that expression is entitled to First Amendment protection against civil litigation. *See, e.g., Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), (holding that parody featuring fictional story of plaintiff losing his virginity to his mother in an outhouse was protected by First Amendment against claim for intentional infliction of emotional distress); *Ann-Margret v. High Society Magazine, Inc.*, 498 F. Supp. 401, 404 (S.D.N.Y. 1980) (stating that "the First Amendment transcends the right to privacy," and dismissing New York Civil Rights Law claim brought against magazine, which court described as "tacky," that published nude photographs of celebrities).

Supp.2d 446, 455 (S.D.N.Y. 2008) ("The First Amendment protects parodies because they are valid forms of artist expression and criticism").

### 1.     The Images are Not Commercial Speech.

Mr. Charney's Images do not meet the United States Supreme Court's definition of commercial speech, which is "speech which does no more than propose a commercial transaction," and "is so removed from any 'exposition of ideas.'" *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). There are three factors necessary to analyze this issue: (1) whether the speech is an advertisement; (2) whether the speech refers to a specific product or service; and (3) whether the speaker has an economic motivation for the speech. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67, 103 S.Ct. 2875 (1983); *New York State Ass'n of Realtors, Inc. v. Shaffer,* 27 F.3d 834, 840 (2d Cir. 1994). An affirmative answer on any of these three questions does not alone establish that the speech is commercial. *See Bolger*, 463 U.S. at 66-67. Further, "[e]ven pure commercial speech is entitled to significant first Amendment protection." *ETW*, 332 F.3d at 925 (citing to *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423, 113 S.Ct. 1505 (1993)).[5]

It strains the imagination to identify what "commercial transaction" is proposed by the Images, and the Images do not qualify as commercial speech under the *Bolger* factors. The Images do not feature or refer to any of American Apparel's products, and so do not offer anything for sale. It is also not clear how the Images could function as mere advertisements for

---

[5]     *See also Bd. of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 473-74, 109 S.Ct. 3028 (1989); *Central Hudson Gas and Electric Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 100 S.Ct. 2343 (1980); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Bolger*, 463 U.S. at 66 ("The mere fact that these pamphlets are conceded to be advertisements clearly does not compel the conclusion that they are commercial speech"); *Lacoff v. Buena Vista Pub., Inc.*, 705 N.Y.S.2d at 189 ("Paid advertisements can even be noncommercial speech, fully protected by the First Amendment.").

American Apparel.  There is a vast incongruity between the Images and American Apparel's past and present advertising campaigns, which have almost exclusively featured photographs taken with an amateur aesthetic, of young, "ordinary" people, often scantily clad in American Apparel's clothing and products.  The Images therefore simply do not fit into any public perception of American Apparel, its lines of products, or its established branding.

A case involving a television program produced to promote a new video game provides a useful contrast.  In *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008), a Lanham Act claim was brought by the estate of a sports announcer, whose recorded voice was used in the program.  The Third Circuit concluded that the program was merely commercial speech, finding that the program's purported "artistic and informational messages…amount to mere praise for the [video game] product."  *Id*. at 1018.  In the instant case, however, the Images do not communicate anything at all to observers about American Apparel's products or even what American Apparel is.  Again, unlike the television program in *Facenda*, which was clearly targeted to potential purchasers of the video game, the Images are not directed at American Apparel's customers in any recognizable manner.  The typical customers of American Apparel are in their teens and might not even recognize Allen's character from *Annie Hall*, a film released in 1977 before most of them were born.  *Cf. New York Public Interest Research Group, Inc. v. Insurance Information Institute*, 161 A.D.2d 204, 206, 554 N.Y.S.2d 590, 592 (1st Dep't 1990) (finding that advertisements paid for by insurance lobbyists "do not propose a commercial transaction since they are not specifically directed at potential purchasers of the advertisers product; instead, they address issues of malpractice, product and liability insurance costs.").

Though the name of Mr. Charney's company, "American Apparel," appeared in the Images, and some of the Images appeared on American Apparel's non-commercial website, this

affiliation with "American Apparel" was to identify Mr. Charney as the speaker and artist, who was communicating through the recontextualized screenshots, and whose name alone would not sufficiently establish a nexus between himself and the social issues that he was speaking out on and had struggled with for many years.[6]

In *ETW*, the Sixth Circuit analyzed whether commercially marketed prints depicting the painted likeness of golf celebrity Tiger Woods constituted commercial speech. Although the prints clearly bore the artist's name, and thus arguably promoted him and his art, the Sixth Circuit ruled that the prints were not commercial speech because "[t]hey do not propose a commercial transaction." *Id.* at 925. In other words, the mere identification of an individual or company that otherwise engages in commerce is insufficient to categorize speech as purely commercial.

      2.    **Even Mixed Commercial and Noncommercial Speech Is Protected by the First Amendment.**

Further, where the main purpose of a work is noncommercial and the commercial and noncommercial components are "inextricably intertwined," a court "cannot parcel out the speech, applying one test to one phrase and another test to another phrase…Therefore, we apply our test for fully-protected expression." *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 795-96 (1988); *see also Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632, 100 S.Ct. 826, 834 (1980) (charitable solicitation not subject to First Amendment protection level of pure commercial speech, because it "does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services"); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185 (9th Cir. 2001) (holding that fashion article featuring film still of actor computer-modified to wear Ralph Lauren

---

[6]    In May of 2007, American Apparel was a privately held corporation controlled by Dov Charney.

designs was not commercial speech, because "[a]ny commercial aspects are inextricably entwined with expressive elements, and so they cannot be separated out from the fully protected whole" (internal marks omitted; citing to *Riley*)).

This Court recognized that a combination of commercial and non-commercial speech must be analyzed under the test for fully-protected expression in *Burck v. Mars, Inc.*, 571 F. Supp. 2d 446. *Burck* involved an advertisement featuring one of the defendant's M&M characters dressed as the plaintiff's performing persona, "the Naked Cowboy." This Court denied the plaintiff's motion to strike the defendant's defense that its advertisement was a parody protected by the First Amendment, noting that "[c]ourts have recognized…that a parody may have 'hybrid' uses, i.e., a parody can be a product and, at the same time, advertise that product." *Id.* at 457 (citing to *Rogers*, 875 F.2d 994). Based upon these well-established principles, this Court should hold that the Images are entitled to full First Amendment protection.

### B.     Under the *Rogers* Test, the Lanham Act Claim Must be Denied.

When, as here, a defendant's First Amendment rights are pitted squarely against a person's false endorsement or publicity rights, the court must decide which parties' rights prevail. To do this, the Second Circuit established a two part test that has become known as the *Rogers* test. *See Rogers*, 875 F.2d 994. The *Rogers* test bars Lanham Act claims arising from works of creative expression *unless* the use of the celebrity's name or likeness "has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the [usage of the celebrity's name or likeness] explicitly misleads as to the source or the content of the work." *Id.* at 999. Three other Circuits have now adopted the *Rogers* test. *See Sugar Busters LLC v. Brennan,* 177 F.3d 258 (5th Cir. 1999); *ETW*, 332 F.3d 915; *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002).

15

As this Court is uniquely aware, *Rogers v. Grimaldi* involved a claim brought by classic Hollywood actress Ginger Rogers against the film "Ginger and Fred," which was written and directed by esteemed Italian filmmaker Frederico Fellini. Rogers claimed that the title's reference to her and her long-time partner in film, Fred Astaire, misleadingly implied that she was connected with the film, when in fact the film referenced her and Fred Astaire's names because the fictional characters in the film patterned their careers after them. The Second Circuit applied its test to rule that the film's reference to her in its title constituted protected expression, which outweighed any likelihood of confusion.

As the legislative history of the Lanham Act shows, Congress was aware of its potential for conflict with the First Amendment and did not intend for its protections to supersede those of the First Amendment. During a discussion regarding the Lanham Act's 1989 revisions, Congressman Robert W. Kastenmeier stated that the "proposed change in section 43(a) should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires, or other constitutionally protected material." 135 Cong. Rec. H1216 (1989) (statement of Rep. Kastenmeier). If courts applied the Lanham Act in a manner that unreasonably prevented "filmmakers, novelists, painters, and political satirists from including trademarks in their works [, these rulings would] cordon off an important part of modern culture from public discourse." *Id.* Courts have, therefore, been cautious not to overextend the Act by intruding upon First Amendment values, especially in the context of artistic expression.

It is with these concerns in mind that the Second Circuit established the *Rogers* test and ruled that "in general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." 875 F.2d at 999. Although the Second Circuit initially framed the test in terms of

16

the use of a celebrity's name in the title of a protected work because of the facts at issue in that

particular case, the Second Circuit held in *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub.*

*Group, Inc.,* 886 F.2d 490, 495 (2d Cir. 1989), that the *Rogers* test is not limited to literary titles,

but is generally applicable to Lanham Act claims against works of artistic expression.

The *Rogers* test has clear applicability here to the expressive use of a celebrity's likeness.

The Sixth Circuit applied the *Rogers* test in such a case, involving a marketed art print that

depicted celebrity golfer Tiger Woods. *ETW Corp.*, 332 F.3d 915. Just as in this case, where

Mr. Allen claims that his presence in Mr. Charney's Images implies that he has endorsed

American Apparel's products, Woods raised a false endorsement claim in *ETW*, arguing that "the

presence of Woods's image in Jireh's print implies that he has endorsed Jireh's product." *ETW*,

332 F.3d at 925. The Sixth Circuit compared the tests adopted by various Circuits for

evaluating Lanham Act claims against creative works, and concluded that the *Rogers* test most

properly balanced the interests at issue.

Noting that, while in "the ordinary false endorsement claim, the controlling issue is

likelihood of confusion," the Sixth Circuit concluded that "where the defendant has articulated a

colorable claim that the use of a celebrity's identity is protected by the First Amendment, the

likelihood of confusion test is not appropriate because it fails to adequately consider the interests

protected by the First Amendment." *Id.* at 926. The Sixth Circuit adopted the *Rogers* test for

this purpose, agreeing with the Second Circuit that other tests did not "sufficiently accommodate

the public's interest in free expression." *Id.* at 927.

Under the *Rogers* test, Mr. Charney's First Amendment expression is protected against

Mr. Allen's Lanham Act claim, unless his use of Mr. Allen's likeness in the Images "has no

artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless

17

the [usage of the celebrity's name or likeness] explicitly misleads as to the source or the content of the work." *Rogers*, 875 F.2d at 999. Mr. Allen's likeness in the screenshots Mr. Charney selected from *Annie Hall*, are extremely relevant to the message Mr. Charney intended to communicate through the Images. As described in greater detail above, Mr. Charney wished to express his personal identification with Woody Allen, with whom he empathized regarding the widely publicized media sensationalism of sexual scandals that both individuals had experienced. Mr. Charney was expressing his feeling of being out of place and misunderstood. He took the image of Mr. Allen as Alvy Singer, feeling self-conscious and stereotyped under the judgmental gaze of others, and held that image up to say "This is me."

Further, the Images do not explicitly mislead the public into thinking Mr. Allen has endorsed Mr. Charney's company or products. As explained above, the Images do not refer to any products, and the words "American Apparel" only appeared on the Images to identify Mr. Charney (who is known primarily as "the guy from American Apparel") as the speaker. Further, the Images used preexisting images of Mr. Allen disguised as an Orthodox Rabbi, from a well-known film that is a part of American popular culture, released in 1977. Mr. Charney's recontextualization and alteration in 2007 of pictures he found that were produced in 1977 makes it unlikely that anyone would imply that Mr. Allen had, in 2007, decided to promote Mr. Charney's company. The Images undeniably reference Mr. Allen, and visually quote one of his most famous films, but this does not mean the Images purport to speak on his behalf.

Especially informative is the Yiddish text Mr. Charney superimposed on the billboards, which identified Mr. Allen as "The Holy Rebbe" or "Our Spiritual Leader." There is no way to interpret these words as implying a message *from* Mr. Allen, as they are instead speaking *about* him. The text clearly communicates not how *Mr. Allen* feels about *Mr. Charney* or his company,

18

but rather how *Mr. Charney* feels about *Mr. Allen*.  If the Images communicated or implied any endorsement, it is that Dov Charney and American Apparel endorse Woody Allen as their "Spiritual Leader."  And, of course, the Yiddish text had double-meaning and referenced the anti-Semitic themes throughout the film, a form of prejudice Mr. Charney has also endured.

It is true that some survey evidence collected, assuming its validity, indicates that some members of the public would incorrectly infer that Mr. Allen had some connection with American Apparel, just as did the plaintiffs in *ETW* and *Rogers*.  As the Sixth Circuit correctly stated, however, "[t]he risk of misunderstanding…is so outweighed by the interest in artistic expression as to preclude application of the [Lanham] Act."  *ETW*, 332 F.3d at 937.  Like the Tiger Woods print in *ETW*, Mr. Charney's Images do not "engender [this misunderstanding] by any explicit indication on the face of" the Images.  *Id.*  Mr. Charney's recontextualization of the screenshot from *Annie Hall* is, instead, clearly understandable only as a quotation of that film.  Accordingly, an ordinarily prudent observer of Mr. Charney's Images would have no difficulty discerning that Mr. Allen's depiction of himself as a Hasidim in *Annie Hall* is merely the subject matter of the Images, and does not in any way indicate his sponsorship.  *Cf. Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585 (2d Cir. 1990) (ruling that consumers would not believe that calendar featuring photograph of Babe Ruth was sponsored by Ruth's estate, but rather that Ruth was its subject).

## III.  American Apparel is also Entitled to Summary Judgment on the New York Civil Rights Act Claim Based on the Free Speech Guarantees of the First Amendment and Article 1, Section 8 of the New York State Constitution.

Sections 50 and 51 of the New York Civil Rights Act set forth the right of privacy and publicity.[7]  "Sections 50 and 51 are limited in their reach because of the First Amendment."

---

[7]      In order to establish liability for invasion of the right to privacy under New York's Civil Rights Law, a plaintiff must demonstrate four elements; to wit:  the defendant (1) used the plaintiff's picture for advertising or

*Burck*, 571 F. Supp.2d at 451; *see also Ann-Margret*, 498 F. Supp. at 404 (stating that "the First Amendment transcends the right to privacy."). The advertising and trade limitation in New York's privacy statutes was crafted with the First Amendment in mind. Through Sections 50 and 51, the New York legislature sought to protect a person's right to be free from unwarranted intrusions into his or her privacy, while at the same time protecting the quintessential American right to freedom of expression. *See Waters v. Moore,* 70 Misc.2d 372, 334 N.Y.S.2d 428, 434 (N.Y. Sup. Ct. 1972); *Rubino v. Slaughter,* 136 N.Y.S.2d 873, 874 (N.Y. Sup. Ct. 1954).

New York courts have taken the position in the right of privacy context that art is speech, and, accordingly, that art is entitled to First Amendment protection vis-à-vis the right of privacy. In *Simeonov v. Tiegs,* 159 Misc.2d 54, 602 N.Y.S.2d 1014 (N.Y.City Civ.Ct. 1993), for example, Cheryl Tiegs, a well-known model, sought to prevent a sculptor from creating 20 bronze busts of her likeness to be sold for $20,000 each. The court determined that the bronze sculptures were protected expression under the First Amendment and that Tiegs' right of privacy claim must fail. The court held that "[a]n artist may make a work of art that includes a recognizable likeness of a person without her or his written consent and sell at least a limited number of copies thereof without violating [Sections 50-51].... Although a person's right of privacy as protected by Civil Rights Law sections 50 and 51 is also a very significant right, it must fall to the constitutionally protected right of freedom of speech." 602 N.Y.S.2d at 1018.

Significantly, in *Hoepker*, 200 F. Supp.2d 340, this Court dismissed section 50 and 51 claims brought against conceptual artist Barbara Kruger, by an individual whose photograph

---

trade purposes (2) within New York (3) without Plaintiff's consent and (4) there was a direct and substantial connection between the appearance of plaintiff's name or likeness and the main purpose and subject of the work. *See* Civil Rights Law §§ 50 and 51; *see also Beverly v. Choices Women's Medical Center, Inc.*, 78 N.Y. 2d 745 (1991); *Cohen v. Herbal Concepts*, 63 N.Y.2d 379 (1984); *Molina v. Phoenix Sound Inc.,* 297 A.D.2d 595 (1st Dep't. 2002); *Schoeman v. Agon Sports, LLC*, 816 N.Y.S.2d 701 (N.Y. Sup. Ct. 2006); *D'Andrea v. Rafla-Demetrious,* 972 F. Supp. 154 (E.D.N.Y. 1997), *aff'd.,* 146 F.3d 63 (2d Cir. 1998).

Kruger used in her work.  Kruger found a photograph taken by another artist that depicted the plaintiff, altered the photograph by cropping and enlarging it and transferring it to silkscreen, and then added her own selected text.  *Id.* at 342.  This method of expression, which the court in *Hoepker* found protected by the First Amendment against the New York Civil Rights Law claim, is essentially the same method of expression that Mr. Charney used in the Images—the recontextualization of found images through selection, alteration, editorializing and representation in a new context.  Accordingly, the New York Civil Rights Act claim also must be dismissed with prejudice.[8]

---

[8]    Even if the First Amendment does not defeat Mr. Allen's claim under the New York Civil Rights Act, the claim still fails because Mr. Allen cannot establish that the Images were used for commercial or trade purposes.  The deposition testimony of the American Apparel witnesses, including Mr. Charney's sworn testimony, establishes that the Images were not part of an advertising or marketing campaign by American Apparel.  As discussed at length above, Mr. Charney had absolutely no intention of increasing sales of American Apparel product in displaying the Images.  Simply put, a commercial or trade purpose was the farthest thing from Mr. Charney's mind when he created the Images and caused them to be displayed.

## CONCLUSION

For the reasons set forth herein and in the accompanying papers, Mr. Allen's claims

against American Apparel, Inc. fail, and the Complaint should be dismissed with prejudice.

DATED:      New York, New York          BUCHANAN INGERSOLL & ROONEY PC
            May 7, 2009

                                        By: _____
                                            Stuart P. Slotnick (SS-1964)
                                            Ryan P. Farley (RF-6984)
                                            Kristi Davidson (KD-4753)
                                            David L. Frison (DF-5870)

                                            620 Eighth Avenue, 23rd Floor
                                            New York, New York  10018
                                            Tel:  (212) 440-4400

                                            *Attorneys for Defendant American Apparel, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Memorandum in Support of Defendant's Motion for Summary Judgment is being served via ECF this 7th day of May, 2009 upon the following counsel of record for Plaintiffs:

Michael P. Zweig
Christian Carbone
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154-1895